## MARY POOKAPU KAHOUOKALIMA MAKALIILII vs. THE BARK OLYMPIC COMPANY.

### April 19, 1905.

*Negligence of Employe and his Fellow Servants Resulting in Injury to Him.—Contributory Negligence of Employer:*  Where an employe is killed in consequence of his own carelessness and that of his fellow servants, and their disobedience of the orders of the employer, his representatives are not entitled to damages unless the employer might have avoided the consequences of such negligence and disobedience of orders, by the exercise of reasonable care and prudence.

*Reasonable Care on the Part of the Employer:*  Where, in such a case, the agents of the employer gave positive and repeated instructions to the employes which, if followed, would have avoided the accident which resulted in the death of one of them, reasonable care was exercised which relieved the employer from liability.

*Safe Place in which to Work:*  The breaking of one of the strongbacks supporting the hatch coverings, in consequence of the action of employes in landing slings of sugar upon such hatch coverings contrary to the orders and instructions of the agents of the employer, is no proof that the employer did not provide them with a safe place to work, if such strongback was sufficient for the purposes for which it was intended, towit, the protection of the hold from the elements, including sea water, and such pressures as it might receive in the management of the ship from the crew standing on it or throwing coils of rope upon it.

*Credibility of Witness:*  The credibility of a witness may be affected by his proved hostility to the party against whom he testifies, together with the unlikely character of his testimony.

In Admiralty:    Libel *In Personam* for Damages for Death of Husband.

J. J. Dunne, Proctor for Libellant.
Kinney, McClanahan & Cooper, Proctors for Libellee.

DOLE, J.    The plaintiff, claiming to be the surviving widow of Samuel Makaliilii, deceased, filed her libel against the defendant, a California corporation and owner of the American bark "Olympic," belonging to and hailing from the port of San Francisco, in the State of California as her home port, and complains, in substance, that on Monday, July 11th, 1904, while the said vessel was lying in the port of Honolulu in the Territory of Hawaii, and was engaged in loading a cargo of sugar for transportation elsewhere, the said Samuel Makaliilii with other persons was engaged in loading upon the said vessel her cargo; with allegations showing the good health of the said Makaliilii, the wages which he was earning and had been earning for a long time previously, out of which he provided his own support and that of the libellant; that on the said day the said Samuel Makaliilii came to his death through and in consequence of the carelessness and negligence of the libellee and without fault, carelessness or negligence on his own part, by being precipitated into the hold of the said vessel through the breaking of the strongback which was one of the two supports of the movable hatches in position, the third hatch being removed for the purpose of allowing the loading of said cargo into the hold of the vessel, the said Makaliilii, standing at the time with one of his feet on the said strongback and the other on one of the said hatches, he being engaged at the time in receiving and loading the said sugar.    The libel further alleges that the said strongback was rotten, unsound, defective, unsafe and insufficient for any of the uses or purposes for which it was intended and designed, and that the said Makaliilii did not know of such condition of the said strongback nor have any means or opportunity of ascertaining the same; and that the said accident by which the said Makaliilii met his death, was

caused by the carelessness and negligence of the libellee in failing and omitting to provide a safe place to work for the said Makaliilii, in consequence of the defective condition of the said strongback which was supplied and furnished by the libellee. The libel contains allegations as to the previous marriage of libellant to the said Makaliilii, and that they continued to live together as husband and wife up to the time of the death of the said Makaliilii as aforesaid; and that by reason of the death of the said Makaliilii, the libellant had sustained damage in the amount of fifty thousand ($50,000.00) dollars; with prayer for process and attachment of the goods and chattels of the libellee within the said Territory to the amount sued for, and for decree and sale of said goods and chattels for realization of said damages and costs.

The answer admits that the said strongback was a necessary appliance of the vessel and was supplied by the libellee, and that the deceased had nothing to do with its selection, character, material or fitting; and further admits that the said beam was completely covered with paint so that it was impossible to tell from its outward appearance what its internal condition was; but denies that at the time and place of the death of the said Makaliilii, such strongback was "rotten, unsound, defective and wholly insufficient for the uses and purposes for which it was designed or intended," and alleges that the said strongback was wholly sufficient for the uses and purposes for which it was designed and intended, and that the sole and only purpose for which said strongback, with the other strongback of the said hatch, was used, was supporting the hatches proper and to secure them, and to protect the hatch and hold of the vessel from sea water and from exposing the hold and the cargo therein to the elements; and that the said strongbacks were in no sense appliances of the vessel for the purposes to which they were put by Makaliilii at the time he came to his death, which use was alleged to be as follows: That the said Makaliilii and his fellow servants were engaged in receiving cargo on board the said bark "Olympic," which was being discharged from the steam-

ship "Kaiulani," lying along the starboard side of the bark "Olympic," and that a suitable platform or table had been built between the bulwarks and the hatch of the bark "Olympic" for the receiving of the said cargo from the tackle used in removing the same from the steamer "Kaiulani" to the bark "Olympic"; and that the master of the said bark and his subordinate officers had given positive instructions to the said Makaliilii and his fellow servants to receive the said sugar upon the said platform or table and had forbidden them to receive the same upon the hatches; that the said sugar was delivered in slings of fifteen bags, each sling weighing in the aggregate about eighteen hundred and seventy-five pounds; and that, in disobedience and in contravention of the orders given by the officers of the said bark, the said Makaliilii and his fellow servants persisted in directing the discharge of the said slings of sugar upon the said hatches instead of upon the platform or table which had been provided therefor; that the said strongbacks were not constructed for the purpose of sustaining the shock of receiving such gross weights as they were subjected to by the action of the said Makaliilii and his fellow servants by the landing of said slings of sugar upon the said hatches; and that said acts of said Makaliilii and his fellow servants directly and proximately caused the splintering and breaking of the said strongback which finally broke while the said Makaliilii was standing thereon; and that said actions of said Makaliilii and his fellow servants in this regard were grossly careless and negligent and not only contributed to, but were the proximate cause of the accident which occurred to Samuel Makaliilii as alleged in said libel. The answer further alleges that the said Makaliilii and his fellow servants knew that the said strongback was not an appliance for the purposes for which they used it and in using the same as they did, they assumed all the risks incident to such use of said beam, one of which was that it was likely to break when subjected to the great pressure put upon it by them; and submits by reason of these facts the libellee is not responsible for the accident which

took place. The answer further denies that libellant has suffered any damage by reason of any carelessness or negligence on the part of the libellee, and says it has not sufficient information on which to form a belief as to whether libellant has suffered any damage in the death of said Makaliilii; but that the libellee is informed and believes that said Makaliilii and the libellant never married or became husband and wife, and therefore denies the allegations in this regard in the said libel contained.

Evidence was taken partly before the federal commissioner and partly before the court. Considerable testimony was taken for and against the allegation of the marriage of libellant with the deceased, and also on the question of negligence of the deceased and negligence of the libellee and in reference to the circumstances relating to the alleged accident and death of the deceased. On the question of negligence, the broken strongback was produced in court. It is a beam of hard wood about ten feet two inches long, seven and a half or eight inches thick and about eight and a quarter inches deep. Near the middle there is a cross break from the top extending about half way down, then a split running horizontally about a foot and a half, then a ragged perpendicular break about two inches and a half down and then a diagonal break to the lower side of the beam about five inches and a half long. There is little, if any, splintering of the wood at any part of this break, the wood appearing brittle. The beam was admitted by the witnesses for the libellee to be defective; Alexander Young, the mate of the "Olympic," testifying that the condition of the strongback was "not too good, * * * it had a little rot attached to it, but "I considered it was perfectly safe for the work it was put there "for. It would have lasted for years for that purpose. It was "not put there for throwing a ton of weight on the top of it. "It was put there for the protection of the seas when water was "thrown on it and so forth." The testimony of the witnesses for the libellee was to the effect that Makaliilii and his three associates, who were engaged in loading sugar into the hold, in-

sisted on lowering the slings of sugar coming over from the steamer, onto the top of the two remaining hatches, and that the sugar coming over the bulwarks, which were about five feet high, was partially lowered over the table of sugar bags referred to, by the direction of Makaliilii and his associates and then by them swung over the hatches and then lowered on the hatches from heights of a few inches to several feet, the evidence varying, the carpenter Stover testifying that he saw the sugar drop from five feet to the hatch, the captain testifying that slings were lowered to about four feet above the deck, which would be two and a half feet above the platform, which was the same level as the top of the hatch. Ansberg, one of the associates of Makaliilii in loading the sugar, testified on behalf of the libellant, "there was never no sling of sugar landed right square "on the hatch." Kauahi, another of those engaged in loading the sugar, gave no evidence on this point except that at the time of the accident "there were two (bags of sugar) here (pointing on the hatch model near the starboard side) and the other was near the strongback." But Kaalele, the third associate of Makaliilii, in this work, there being only four altogether including Makaliilii, on being called for the libellant, testified on cross-examination as follows: "Q. And you landed all "your sugar upon this sugar table? A. Sometimes on the "edge of the hold of the opening and sometimes further on, the "middle of the hatch. Q. How many times did you land the "sugar on the hatches proper? A. I couldn't tell you, because "sometimes—I couldn't tell you, because we worked very fast "and were not permitted to allow the slings to hang a minute "more than they could help, so I couldn't tell you how many "times. Q. Isn't it a fact that when it came time to put the "sugar down the chute, which was placed in between the two "strongbacks and rested upon the starboard strongback, that you "put the sugar upon the hatches proper? A. Yes. * * * "Q. And he (person who marked the sugar) would follow up "the location of each particular sling when it came on. If it "was on the sugar table he would go there and mark it and if

"it was on the hatch he would go there and mark it? A. Yes."

The testimony of the witnesses for the libellee shows that the captain and mate repeatedly interfered with the action of the stevedores, including Makaliilii, in lowering the slings of sugar onto the hatch, telling them several times to desist. The captain says: "I went forward several times and each time I "went forward I told them not to land the sugar on the hatch, "that the platform was made to land the sugar on, that was "what the platform was for." Also, "I told them not to do it "any more, and threatened to stop them from working if they "continued to lower it on the hatches." Alexander Young, the mate, says: "They started to land the sugar loads on the "hatches and I told them not to land any sugar on the hatches, "to land it on the sugar platform. On several occasions I told "them. Well, they did land it again on the hatch when I "would be somewheres else. I couldn't always be by the "hatch. * * * They told me, 'Oh, all right, sir.' They "all talked English more or less." "Q. About how long after "you told them to quit putting sugar on the hatch did you see "them doing it again? A. On several occasions. I spoke to "them right away again and I told them to land no more there "on the hatches; that the hatches were not put there for land-"ing sugar on whatever. Q. What did they say then? A. "Well, then they stopped it while I was there again."

The testimony of an expert, Max Lorenz, a civil engineer who had had experience in calculating weights and pressures of different characters, was introduced in regard to the force of falling weights. His testimony, as reported, is such a confused statement as to make it difficult for the court to fully utilize it. There is enough of it, however, that is intelligible, to inform the court, together with such scientific facts as it may take judicial notice of, that the impact of a weight falling from different heights is augmented as the height is increased out of all proportion to the comparative increase in height, and under the evidence that the height from which the slings were dropped onto the hatches, varying from several inches to from two

to five feet, the force of the impact would be several times the original weight of the sling, under which, blows varying from about a ton to several tons were repeatedly delivered upon the hatches in question by the method of receiving the sugar adopted by the deceased and his associates.

The breaking of the carlines of the hatches which received the direct impact of these blows,—as testified to by the master,—Evans, and the carpenter,—Stover, is a circumstance showing that the hatches received undue weights in the process of lowering the sugar upon them.   These carlines which had transverse dimensions of three inches by three, were of oak and in good condition before the accident; after the accident, they were found to be broken and splintered.

Counsel for libellant contended that the testimony in regard to the altitudes from which the slings of sugar dropped to the deck, was of doubtful credibility, on the ground that bags of sugar in slings of fifteen bags each could not stand the strain of such shocks, but must inevitably burst.   On this point, Kaalele, a witness for libellant, testified that bags falling four or five feet would burst but falling a distance of a foot and a half or two feet would not.   The master testified, on cross-examination, that eighteen hundred and seventy-five pounds of sugar falling from "a height, suddenly, swiftly on a ship's deck," the bags would not necessarily be split but would sometimes.   As the height was not given, this evidence is of little use unless it can be taken for granted that the word "height" in the question, referred to the altitudes already testified to.

I do not consider that Kaalele's testimony disproves all the evidence adduced as to the altitudes over two feet from which the sugar was dropped to the hatches.

It appears by the evidence both of witnesses for the libellant and the libellee that the strongback was painted and did not afford from its general appearance any evidence of its defective condition.   Also, in view of the contention that the libellee's agents should have removed the two remaining hatches in order to have prevented the stevedores from landing sugar upon

16—U. S. D.

them, the evidence of witnesses for the libellee to the effect
that the object of placing two of the three hatches in position
was to protect the stevedores from being knocked into the hold
by the swinging slings of sugar, is to be considered in relation
to the charge that the libellee was guilty of contributory negli-
gence.

I am able, on the pleadings and evidence, to make the follow-
ing findings:

The premises were safe for the work of loading the sugar
as it should have been carried on, and as the ship's officers en-
deavored to have it carried on. The strongback, the break-
ing of which caused the accident, was sufficient for the purposes
for which it was intended. It was not intended to support a
strain of landing sugar in slings on the movable hatches resting
upon it. The accident which resulted in the death of the de-
ceased was due to the negligence, and willful disobedience of
deceased and his associates of the orders of the ship's officers.
The accident would not have occurred but for such negligence
and willful disobedience.

These findings narrow the issue on the question of the libel-
lee's liability. The libellant claims that although the deceased
may have been negligent yet the officers of the libellee, seeing
that the deceased and his associates were endangering them-
selves by their negligence, should have prevented a continua-
tion of the practice of landing the sugar on the hatches, and
failing to do so were liable for the accident which caused the
death of the deceased. This proposition raises the question of
how far an employer is required to go and how responsible he
is under circumstances in which his employes have brought
about a condition endangering themselves. There are cases in
which an employer is held responsible for an injury caused by
the negligence of a fellow servant of a person injured where
such negligence was of long standing and known to the employer
or in regard to which, in the management of the business, he
ought to have known. The *Ohio & Mississippi Railway Co. v.
Collarn,* 73 Ind. 261, 273. There are also cases in which the

rule is recognized that even in case of negligence by the employe resulting in his injury, the employer will still be liable if he "might by the exercise of reasonable care and prudence, have "avoided the consequences of the injured party's negligence." *Grand Trunk Railway Co. v. Ives,* 144 U. S. 408, 429; *Inland & Seaboard Coasting Co. v. Tolson,* 139 U. S. 551, 558.

Evidence was adduced on behalf of the libellant to show that the ship's officers were aware of the defective condition of the strongback which subsequently broke, and consulted each other about it and finally instructed the carpenter to put a short board between it and the carlines of the hatches resting upon it. The leading witness in this line of evidence was Pierre Blanthe, the second mate of the vessel, who testified that, before the accident, a board was placed on the upper side of the strongback which afterwards broke, between it and the carlines of the hatches above it, and he thinks that the mate put it there. Kauahi, one of the witnesses for the libellant, testified that he noticed this board there but did not see who put it there; another of the stevedores testified that he did not see the board placed there and did not see it there. It was agreed between counsel that Alexander Young, who had already made a deposition and had left the country, would, if he was present, deny that Pierre Blanthe called his attention to a break in the strongback under consideration and would further deny that he placed the board in question between the strongback and the hatch. It was also admitted by Mr. Cooper, counsel for libellee, that Chris. Stover, the carpenter, put the board there. This testimony was introduced to show negligence on the part of the mate of the ship, who, being informed by Pierre Blanthe, as the latter testified, that the strongback was sprung and in a breaking condition, had this board placed on the top of it, between it and the carlines of the hatches, the effect of such action being naturally to cause whatever weight might be on the hatches to press on the strongback. If this testimony is to be relied upon, it would undoubtedly be contributory negligence on the part of the libellee

and would entitle the libellant to at least half the damages that might be awarded, in case it should be found that she is the widow of the deceased. It however appeared from the evidence that in consequence of some friction between Pierre Blanthe and the wife of the master, he had deserted the ship after the accident and was in an angry state of feeling against the captain on account of not being allowed his wages; under which feeling he made various remarks in connection with this suit in the nature of threats that he would oppose the libellee's interests in the case by furthering the case of the libellant. These threats and remarks were made by him in the hearing of at least three witnesses and have not been impeached. This man was a witness for the libellant, and testified to calling the chief mate of the ship between the decks shortly before the accident happened "to see how the beam was broke,—sprung, it was not quite broke." This referred to the hatch beam. Blanthe, on his cross-examination, admits that he said to the man at Hackfeld's where he made his demand for his wages, "If you don't pay me off I will give this whole thing away," and "I will go to Mr. Dunne," counsel for libellant.

But this evidence is to my mind unreliable for two reasons, first on account of the hostile state of mind of the witness Pierre Blanthe toward the captain of the ship, as stated above, evidenced by the threats he made, which included a threat that he would kill the captain if he ever met him, which, however, was denied by Pierre Blanthe; and secondly, that it is unlikely and incredible that a man of the apparent experience and responsibility of the mate, Alexander Young, judging from his position as first officer of a large vessel, would have authorized the placing of a board in the space between the strongback and the carlines of the hatch by which any weight on the hatch would be made to press with increased force on the strongback, if he had any suspicion that the strongback was sprung and in a breaking condition. If the board was placed in that position under the instruction of Alexander Young, it must have been done without any knowledge or suspicion that the strong-

back was in a defective condition. I therefore leave this evidence out of the consideration of the case.

It seems to me that the action of the ship's officers in repeatedly interfering with the conduct of the deceased and his associates in landing the sugar on the hatch coverings and instructing them as to the proper place to land the sugar, and that the hatch coverings were not put there for that purpose, as above more fully stated, with the fact that deceased and his associates as stevedores might well be supposed to be familiar with everything about a ship's hatch, the associates of deceased having worked before on the same vessel, was a sufficient warning to the deceased and his associates and was reasonable care under the circumstances on the part of the agents of the libellee, to relieve it from liability.

This being the conclusion of the court, it is unnecessary to go into the question of the alleged marriage between the libellant and the deceased.

The libel is dismissed with costs.